NOT DESIGNATED FOR PUBLICATION

No. 127,187

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of F.J., a Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; MICHAEL HOELSCHER, judge. Submitted without oral argument. Opinion filed October 18, 2024. Affirmed.

*Grant A. Brazill*, of Morris Laing Law Firm, of Wichita, for appellant natural father.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before WARNER, P.J., HILL and COBLE, JJ.

PER CURIAM: I.J. (Father), the natural father of F.J., appeals the Sedgwick County District Court's judgment terminating his parental rights. Father challenges the district court's findings regarding parental fitness and the likelihood of future change. On careful review of the record, we affirm the district court's findings.

FACTUAL AND PROCEDURAL BACKGROUND

F.J. entered protective state custody at age three when M.H. (Mother) entered the hospital to give premature birth to F.J.'s sibling due to Mother's drug use. At the time, Father was incarcerated for domestic violence against Mother. When F.J. entered care, she had bruising on her right arm, right thigh, and groin area. The State filed a petition to adjudicate F.J. and the sibling as children in need of care (CINC), and the district court awarded temporary custody of both children to the Kansas Department for Children and Families (DCF). Neither the sibling nor Mother are parties to this action.

1

Father was released from prison in time to attend the CINC adjudication, but he did not contest the allegations within the State's petition. The court found by clear and convincing evidence that the children were without adequate parental care, control or subsistence, that the children were without the care or control necessary for the children's physical, mental, or emotional health, and that the children had been physically, mentally or emotionally abused, neglected, or sexually abused. The court continued DCF custody of the children.

After being released from prison, Father moved to Joplin, Missouri. Saint Francis Ministries (SFM) cooperated with social service agencies in Missouri to find local services for Father to achieve his court-ordered case plan tasks. He completed a parenting class, a batterer's intervention class, and a clinical interview for counseling services. He attended drug treatment. He took a class on nutrition and budgeting. Father visited F.J. for two hours every two weeks, either in person when he traveled to Wichita for hearings or by Zoom. Over several months, Father's visits progressed from supervised visits to monitored visits, back to supervised visits because of a positive urinalysis result, and then back to monitored visits. Father eventually obtained and retained employment and found suitable housing. SFM began the Interstate Compact for the Placement of Children (ICPC) process to have F.J. reintegrated with Father in Missouri. The ICPC petition was approved, and reintegration occurred on August 12, 2022, when F.J. was four years old. Social workers, conducting weekly visits by video and at the home, observed nothing to indicate concern about Father's parenting.

Only five months later, however, F.J. was again removed from Father's home due to allegations of sexual abuse and neglect. F.J. reported her bruising was caused by Mother (whom Father authorized to visit F.J.), but she also expressed fear of Father. F.J. reported that Father would hang a Pennywise mask—designed to resemble a character in a horror movie—in her room to discourage her from getting out of bed. F.J. was terrified of Pennywise and Deer Lady—another character from a horror film wearing antlers.

Father admitted that he owned a Pennywise mask and that F.J. was terrified of it but denied he hung it in her room. F.J. also reported that Father shared alcoholic drinks with her and that he punched and choked her.

After F.J. was removed from his home, Father moved to Billings, Montana. While his stay there was short, he did not provide his caseworkers with an explanation for the sudden move or notify them when he returned to Kansas. He did not notify his caseworkers of his return. As a result, his caseworker mailed resource information to him at the Billings address. On the therapist's recommendation, F.J. did not have visits with Father. The therapist recommended therapeutic input and therapeutic visits before regular visits with Father resumed.

Before his short move to Montana, Father became romantically involved with another woman who had three young children. She had traveled to Montana with Father, and, on their return to Wichita, they stayed in a hotel. On March 14, 2023, Father was arrested for child abuse of these children and domestic violence toward their mother. Father's caseworker attempted to meet with him at the jail but was unable to see him, although she was later able to communicate with him.

A couple of months after Father's arrest, the district court held a permanency hearing and changed the case plan from reintegration to adoption or permanent custodianship. The State filed a motion to terminate parental rights on June 15, 2023. Mother relinquished her parental rights, and the court held a termination hearing in September 2023.

Prior to the termination hearing, Father ultimately pleaded guilty to an amended charge of criminal threat and was sentenced to prison on July 21, 2023. His earliest potential release date was December 8, 2023, but at the termination hearing, Father conceded that a more realistic release date would be March 2024 because he had been

unable to complete some classes for which he was on a waiting list. Father claimed that he had not been contacted by anyone from SFM since he was incarcerated.

After hearing the evidence, the district court took the matter under advisement. On October 17, the court announced its ruling, finding that Father was unfit under multiple statutory factors:  K.S.A. 38-2269(b)(2) (conduct toward child of a physically, emotionally, or sexually cruel or abusive nature); K.S.A. 38-2269(b)(4) (physical, mental, or emotional abuse or neglect or sexual abuse of a child); K.S.A. 38-2269(b)(7) (failure of reasonable efforts to rehabilitate the family); K.S.A. 38-2269(b)(8) (lack of effort to adjust parent's circumstances, conduct, or conditions to meet the needs of the child); and that termination of parental rights was in the best interests of F.J.

Father appealed the district court's rulings from the bench before the journal entry was filed. This premature filing is authorized by Kansas Supreme Court Rule 2.03(a) (2024 Kan. S. Ct. R. at 14). And the district court subsequently filed its journal entry of judgment, finding Father unfit and terminating his parental rights.

THE DISTRICT COURT'S FINDINGS THAT FATHER WAS UNFIT TO PARENT F.J. AND THAT THE CONDITION WAS UNLIKELY TO CHANGE IN THE FORESEEABLE FUTURE WERE SUPPORTED BY CLEAR AND CONVINCING EVIDENCE

Parents who have undertaken their responsibilities to raise children have a constitutional right under the federal and state Constitutions to continue to raise those children. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018). To sever this right, the State must first render an adjudication that the child is in need of care and then must establish clear and convincing evidence that the parent is "unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a); see *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d

4

903 (2014). The foreseeable future is viewed from the perspective of a child, not from the perspective of an adult. *In re R.S.*, 50 Kan. App. 2d at 1117; see K.S.A. 38-2201(b)(4). From a child's perspective, a year or even a month can be a considerable period of time. *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019).

Once a court finds a parent unfit, it must then consider whether termination of parental rights is in the best interests of the child. K.S.A. 38-2269(g)(1). In its deliberation, the court must give primary consideration to the physical, mental, and emotional health of the child. If the physical, mental, or emotional needs of the child would best be served by termination, the court must so order. K.S.A. 38-2269(g)(1).

As for the first step—adjudication—Father stipulated to the allegations contained in the CINC petition, and the court subsequently adjudicated F.J. a child in need of care. Father did not appeal that determination, so it is conclusive for purposes of this litigation. See *Henry v. Railway Co.*, 83 Kan. 104, 108, 109 P. 1005 (1910) ("Ordinarily a question considered and decided on the first appeal is deemed to be settled, and, except for very cogent reasons involving palpable error, will not be reexamined on a second appeal."). The only issues before the court in this proceeding, then, were Father's parental unfitness and the best interests of F.J. Father does not challenge the district court's disposition of the case by terminating his parental rights, except to dispute the prerequisite determination of parental unfitness. Assuming the court properly determined Father unfit, Father has waived any challenge to disposition. See *In re N.E.*, 316 Kan. 391, 421, 516 P.3d 586 (2022) (issues not briefed are waived or abandoned). So, the issue before us is the district court's determination that Father was unfit to parent F.J.

Unfitness has been generally defined as ""unsuitable, incompetent or not adapted for a particular use of service."" *In re T.H.*, 60 Kan. App. 2d 536, 547, 494 P.3d 851 (2021) (quoting *In the Interest of Armentrout*, 207 Kan. 366, 371-72, 485 P.2d 183 [1971]). The State bears the burden to prove both that the parent is unfit at the time of the

request to terminate parental rights, and that the unfitness is unlikely to change in the foreseeable future. *In re L.D.B.*, 20 Kan. App. 2d 643, 646, 891 P.2d 468 (1995); see K.S.A. 38-2269(a).

When a parent challenges the sufficiency of the evidence supporting a finding of unfitness, an appellate court will uphold the decision only if, after reviewing the record in a light most favorable to the prevailing party, the district court's findings are supported by clear and convincing evidence. Stated differently, the government must persuade us that a rational fact-finder could have found it highly probable the circumstances support the district court's finding of unfitness. In evaluating the evidence, we do not weigh conflicting evidence, pass on the credibility of witnesses, or determine factual questions. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014).

In considering a parent's unfitness, the district court is statutorily required to consider several factors but is not limited to only those factors. K.S.A. 38-2269(b). A single factor may establish a parent's unfitness, but the presence of a factor does not automatically establish unfitness. K.S.A. 38-2269(f).

I. *Unfitness and Its Likelihood to Continue*

Here, the district court relied on four statutory factors: K.S.A. 38-2269(b)(2) (conduct toward child of a physically, emotionally, or sexually cruel or abusive nature); K.S.A. 38-2269(b)(4) (physical, mental, or emotional abuse or neglect or sexual abuse of a child); K.S.A. 38-2269(b)(7) (failure of reasonable efforts to rehabilitate the family); and K.S.A. 38-2269(b)(8) (lack of effort to adjust parent's circumstances, conduct, or conditions to meet the needs of the child). And it found the conduct supporting each factor unlikely to change in the foreseeable future. We examine each factor relied upon by the district court in turn.

A. *Cruel or Abusive Conduct—K.S.A. 38-2269(b)(2), Abuse or Neglect—*
   *K.S.A. 38-2269(b)(4), and Improbability of Change in the Foreseeable Future*

Although separate statutory factors, conduct of a cruel or abusive nature toward a child and physical, mental, or emotional abuse or neglect or sexual abuse of a child clearly encompasses conduct that could satisfy either factor or both. In this case, the pertinent conduct of Father generally fits both factors. Father combines his argument related to these factors, and we likewise consider them together.

On appeal, Father does not contest that his conduct constituted abuse or neglect of F.J. He only challenges the evidence supporting the district court's conclusion that such conduct was likely to persist into the foreseeable future. In fact, Father tacitly admitted at the hearing that F.J. had suffered past trauma when his attorney argued that Father had received no trauma-informed training. Father's appellate argument focuses almost exclusively on the testimony of F.J.'s therapist, Bobbie Cooprider, who tied F.J.'s psychological and emotional issues to trauma experienced in Father's home. He then suggests the therapist's conclusions about future reintegration is undermined by the therapist's failure to interview Father to assess the possibility of parent-child intervention therapy.

With respect to abuse or neglect of F.J., Father's argument suggests that the district court's conclusions regarding unfitness rested entirely on Cooprider's testimony while ignoring a significant amount of other evidence. Father has had a history of domestic violence. He was incarcerated on domestic violence charges when F.J. was removed from Mother's care. The CINC petition alleged that he had a long criminal history of domestic violence, and Father did not contest those allegations. Although most of the documented violence was directed toward Mother and other romantic partners of Father, the record reveals that Father physically abused F.J. as well. When F.J. returned to foster care after reintegrating with Father, she told her foster mother that Father would hit her "very hard"

7

and informed her caseworker that Father would choke her. F.J. demonstrated significant fear of Father or persons she believed to be Father.

In addition to evidence of Father's physical abuse of F.J., the record demonstrates that Father also psychologically or emotionally abused this child. F.J. reported that she watched Father physically abuse Mother and his girlfriend and that she watched Father and his girlfriend engage in sexual intercourse in front of F.J. Father admitted that F.J. observed his physical altercations with Mother and his girlfriend, but as noted, downplayed the psychological effect on F.J.

As for the unlikelihood that his abusive behavior would change, Father has continued to use physical violence throughout the case, even after attending classes and counseling designed to help him deal with the anger-management or aggression issues that triggered his exercise of violence. Having the benefit of education and knowing that his ability to maintain custody of F.J. rested on demonstrating his ability to deal with stress in a more productive manner, Father continued to resort to violence against F.J. and against members of her household. Under these circumstances, the evidence reasonably permitted an inference that additional classes and counseling would have little chance of effecting permanent change. See *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018) ("A district court may look to a parent's past conduct as an indicator of future behavior.").

Rhiannon Holmes—the SFM caseworker who had worked with Father for the entire time F.J. was removed from the home—testified that she witnessed no secondary change in Father's behavior or attitudes since F.J. was again removed from his home. This opinion was reinforced by Father's responses to questioning at the termination hearing. He admitted that it was not good that F.J. witnessed Father choking and punching Mother, but he downplayed the effect of observing such violence based on F.J.'s young age at the time. He claimed that leaving children in the care of a person

8

heavily drinking alcohol was fine "[i]f the kids didn't make her angry." He did not see a problem with Mother's use of methamphetamine while she was caring for the children. He also admitted that, while F.J. was in foster care, he did not think through the consequences of smoking marijuana while on probation and using methamphetamine while the CINC case was still pending.

Moreover, Father's attitude during the termination hearing was not indicative of secondary change in his attitudes or behavior. His ideas for preventing future trauma to F.J. revolved around blaming others; they were not self-focused. He compared his parenting favorably to the other parents involved in the case. His solution to past domestic violence was to kick his girlfriend out of his home and to avoid contact with Mother, suggesting the domestic violence stemmed only from his relationships with these women. Father minimized his involvement in F.J.'s situation and did not offer any concrete goals designed to prevent further trauma to F.J. other than to avoid returning to prison because he was tired of being locked up. Father's lack of responsibility for F.J.'s circumstances is indicative of a lack of secondary change in his parental values and abilities.

It is in this context that F.J.'s therapist testified about the psychological and emotional impact of the trauma F.J. had experienced. Cooprider diagnosed F.J. with posttraumatic stress disorder arising from witnessing adult violence. Stemming from this trauma, Cooprider explained that F.J. had difficulty trusting adults. While F.J. has been building trust with her therapist and her foster parents, Cooprider warned that exposure to a harmful relationship could cause regression in that progress. Implying that F.J.'s relationship with Father was one such harmful relationship, Cooprider recommended no contact between F.J. and Father.

Father argues that Cooprider could not properly make this recommendation without exploring the possibilities of parent-child intervention therapy designed to

9

rehabilitate the relationship between F.J. and Father. Cooprider admitted she had no contact with Father and rarely contacted Holmes or anyone else at SFM about him. Contrary to Father's apparent understanding, however, Cooprider's role as a child therapist and witness at the hearing was not to rehabilitate the family, or somehow an extension of the social service agencies tasked with working with Father. Her role as therapist was to help F.J. deal with past trauma and work past it, and her role as a testifying witness was to explain the psychological and emotional toll F.J.'s trauma has had on the child.

Relying exclusively on Cooprider's testimony, Father argues that the State failed to carry its burden to demonstrate that Father's unfitness was unlikely to persist into the foreseeable future because Cooprider made no attempts to contact Father or explore parent-child intervention therapy. But again, this was not the purpose of Cooprider's testimony. As discussed, evidence shows Father has made no permanent change in his parenting attitudes and conduct and supports the conclusion that his parental unfitness is unlikely to change in the foreseeable future, when viewed from F.J.'s perspective.

To try to support his arguments, Father distorts Cooprider's testimony. Cooprider stated that therapy tools theoretically existed that could be used to rehabilitate Father and F.J.'s relationship. But implementing such tools depended on F.J.'s readiness and, based on F.J.'s reaction to seeing someone she thought was Father in a store, Cooprider indicated that F.J. was not yet ready. Moreover, Cooprider opined that a prerequisite to F.J.'s participation in any such therapy would be F.J.'s ability to feel safe. Based on Cooprider's testimony, F.J. did not currently trust adults and exposure to Father could undermine the progress she has made.

As a result, Cooprider—as a mental health professional—opined that F.J. should not have visits with Father within the foreseeable future. This opinion, if relied upon by the court, necessarily precludes reintegration within the foreseeable future.

Even if the court had discounted the therapist's projection regarding the eventual reintegration of F.J. and Father, however, even Father's own testimony estimated reintegration would not occur for another six months. This estimate appears misleadingly low, considering that Father conceded he was unlikely to be released from prison until approximately six months from the date of the hearing, and does not account for the work he would need to complete after his release to accomplish reintegration. He would need to obtain employment and housing in addition to building a rapport with F.J. through therapy and visitation—all after his release.

Holmes tended to side with the therapist that no visitation between Father and F.J. was currently appropriate, but she testified she would only feel comfortable reuniting Father and F.J. if Father entered therapy to address his own issues and to acknowledge the needs of F.J. through trauma-informed training and the ability to demonstrate internalization of that training. She stated that, because of the issues resulting in F.J.'s removal from Father's house, the case plan needed to start over once Father was released from prison. She opined that this process could take between 5 and 10 years, if Father was ever capable of demonstrating his ability to meet F.J.'s needs. Therefore, Holmes likewise testified that Father would remain unfit to meet F.J.'s needs into the foreseeable future.

Parental unfitness is not an obstacle of set dimensions that a parent must clear to regain custody of a child. It is a standard that examines the specific needs of a child in the context of the child's circumstances:

> "We also point out that parental unfitness under the Code is not fault based but, rather, turns on a parent's ability to sufficiently care for his or her child. Neither inattention nor willful misconduct is a necessary condition for a judicial finding. So a parent who tries hard yet cannot adequately care for a child is unfit within the meaning of K.S.A. 2018 Supp. 38-2269(a). See *In re A.L.E.A.*, No. 116,276, 2017 WL 2617142, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 307 Kan. 986 (2017). We have

11

recognized that parents who love their children may, nonetheless, be unfit. See *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008); *In re A.L.E.A.*, 2017 WL 2617142, at *6. Similarly, we have found parents unfit because they cannot meet the special needs of a child with significant physical or mental impairments. See *In re P.L.*, No. 120,220, 2019 WL 2063874, at *4 (Kan. App. 2019) (unpublished opinion) (child's 'ongoing special healthcare needs' factor in finding mother unfit); *In re M.V.J.*, No. 117,401, 2017 WL 5184341, at *5 (Kan. App. 2017) (unpublished opinion) (child's need for 'highly attentive care on a daily basis without interruption or disruption' supported termination of mother's parental rights). Statutory unfitness isn't so much a standardized level of inadequacy applicable across cases as it is a particular condition grounded in the facts of a given case." *In re M.P.*, No. 119,444, 2019 WL 2398034, at *4 (Kan. App. 2019) (unpublished opinion).

Even if Father had not contributed to the physical, emotional, and sexual abuse of F.J., she clearly associates her trauma with him and with his household. The most conservative estimate of time it would take to rehabilitate the relationship is beyond the foreseeable future from F.J.'s perspective. See *In re M.S.*, 56 Kan. App. 2d at 1263 (a month or a year may be too long from a child's perspective). Father simply is incapable of dealing with the trauma F.J. has received within her foreseeable future, regardless of his significant contribution to that trauma—which the record shows he did.

Father has had over two years to effect the secondary change necessary to alleviate the concerns caused by his past conduct. The record provides no indication that Father would ever achieve this change. Moreover, because F.J. suffers from posttraumatic stress disorder associated with Father, there is no reasonable probability that Father could provide a safe and nurturing environment for F.J. in the foreseeable future. Consequently, the record provides clear and convincing evidence that Father's unfitness is unlikely to change in the foreseeable future from the perspective of F.J. See *In re R.S.*, 50 Kan. App. 2d at 1117. Since one factor standing alone may support a finding of unfitness, K.S.A. 38-2269(f)—and here, we have established two such factors—we need not address the

other factors of unfitness cited by the district court. But, for the sake of completeness, we will briefly do so.

B. *Reasonable Efforts Failed to Rehabilitate the Family—K.S.A. 38-2269(b)(7)*

Father next challenges the district court's finding that reasonable efforts by the social service agencies failed to rehabilitate the family because he argues the agencies' efforts were not reasonable. Father contends that SFM was obliged to maintain monthly contacts between Father and F.J. so long as the case plan remained geared toward reintegration.

As Father claims, the case plan goal for F.J. remained reintegration until the permanency hearing held on May 11, 2023, when the court found reintegration no longer viable and directed the State to file a motion to terminate parental rights. Father contends that DCF policies required monthly contact between F.J. and him during the intervening period between her removal from his home in January and the permanency hearing in May, citing DCF's policy and procedural manual. See Kansas Department for Children and Families, Policy and Procedure Manual, § 3237(A)(1)(a) (2020).

While Father correctly cites the applicable policy provision, he fails to mention the exceptions, one of which precludes visitations or interactions when therapeutically inappropriate based on the recommendation of a physician or mental health practitioner. See Kansas Department for Children and Families, Policy and Procedure Manual, § 3237(G)(3). Here the exception is applicable because Cooprider believed that suspension of Father's visits with F.J. were therapeutically warranted.

He also points to the lack of communication between Holmes and Father as a fundamental failure of the case management because Father had no way of knowing what case plan tasks he needed to achieve to work toward reintegration. Father's argument

13

again focuses on a small period within the entire case to the exclusion of evidence demonstrating SFM's significant involvement in assisting Father to succeed in his case plan tasks and court orders.

During the first part of this case, SFM worked diligently to help Father reintegrate with F.J., finding service providers in Joplin to help him achieve his case plan tasks and court orders. The efforts were successful, and F.J. was reintegrated with Father. SFM was recommending closing F.J.'s case. All Father had to do was to maintain his progress in the case. He failed, allowing an unapproved woman and her children to live within his home with F.J. Based on F.J.'s allegations, this led to much of the abuse that caused F.J.'s removal from Father's care.

Within a couple of months after F.J. was removed from his home, Father was arrested and incarcerated for domestic violence. Father complains that SFM did not make reasonable efforts to meet with him or to schedule therapeutic visitations with F.J. to move the case toward reintegration, but he does not articulate any efforts SFM might have made that would have changed the circumstances. He speculates that parent-child interaction therapy involving Father and F.J. might have improved their relationship, permitting reintegration. But based on the testimony of F.J.'s foster mother, F.J.'s therapist, and Holmes, the prospect of effective parent-child interactive therapy was not encouraging.

Reasonable efforts must be "reasonable within the context," and the "parent must also exert some effort to succeed." *In re S.H.*, No. 126,533, 2023 WL 9016352, at *5 (Kan. App. 2023) (unpublished opinion), *rev. denied* 318 Kan. 1086 (2024). Such efforts do not require the social service agencies to expend time and resources engaging a parent in fruitless tasks. Father achieved reintegration with F.J.—an opportunity few parents that this court sees are privileged to experience—but then squandered those efforts by engaging in violent conduct or permitting others to engage in violent conduct. Because of

14

the trauma F.J. experienced while in his home, she was not psychologically fit to engage in visits, without any realistic prospect of becoming mentally fit for interactions with Father within the foreseeable future.

Before Father was arrested and incarcerated, he went to Montana. He did not provide contact information to SFM and was apparently unsuccessful in his claimed attempts to reach out to the Aftercare team. By the time Holmes tracked him down and contacted him, Father was incarcerated. She did not successfully communicate with Father while he was incarcerated. Holmes claimed that she sent letters once or twice a month, but there is no indication whether Father received these letters. This lack of communication between Father and Holmes may not be deemed reasonable efforts on either the agency or Father's parts, but this conclusion does not undermine the district court's finding in the context of the record as a whole.

Efforts by the social service agencies led to F.J.'s reintegration into Father's home. Father's actions in committing abuse or failing to protect F.J. from abuse resulted in F.J.'s removal from his home. While SFM could have communicated better with Father, Father cannot complain that the lack of reasonable efforts after the second removal of F.J. from the parental home contributed to the court's decision to terminate his parental rights. Father was in prison, and because of trauma she had experienced due to his own decisions, F.J. could not have contact with Father. Because Father's previous compliance with court-ordered counseling and education had failed to implement secondary change in Father's behavior and attitudes, repetition of those requirements would likely have been a meaningless exercise. Under these circumstances, the district court's finding that reasonable efforts by the social service agencies failed to rehabilitate the family is supported by clear and convincing evidence. And, for the reasons described above, the district court's finding that these failures were likely to continue into the foreseeable future is likewise supported.

C. *Failure to Adjust Circumstances, Conduct, or Conditions—K.S.A. 38-2269(b)(8)*

Finally, Father challenges the district court's finding that he was unable to adjust his circumstances, conduct, or conditions to meet the needs of his child. He contends that the record indisputably shows that Father did adjust his circumstances on multiple occasions. This argument ties into the discussion of the physical and emotional abuse F.J. suffered while in Father's care and his subsequent inability to make lasting changes.

While Father initially adjusted his circumstances to fulfill case plan tasks or court orders, his completion of classwork, his attendance at therapy, his submission to drug testing, and his efforts to obtain employment and housing did not effect a lasting change in his condition or behavior. After using all these resources, Father still reverted to the same violent conduct that caused him to become incarcerated, to lose his housing, and to lose employment when F.J. was originally placed in protective custody at the beginning of the case. His willingness to adjust his circumstances temporarily did not make a secondary and permanent change in his attitudes and behaviors. He evinced no personal responsibility for F.J.'s trauma and circumstances, instead blaming others for F.J.'s entry into State custody. The evidence overwhelmingly demonstrates that Father was not willing to take responsibility for his part in F.J.'s problems, and that leads to the inevitable conclusion that he has not yet engaged in a meaningful and lasting transformation.

Compliance with case plan tasks and court orders is essential to permit the court and the social service agencies to assess a parent's understanding of his or her role in and competence for taking care of a child. But the adjustment of circumstances, conduct, or conditions addressed in K.S.A. 38-2269(b)(8) speaks to a permanent change of the environmental circumstances, personality traits, relationship issues, or personal habits that led to the child's removal from the home in the first place. See *In re P.H.*, No.

16

121,808, 2020 WL 3022869, at *1 (Kan. App. 2020) (unpublished opinion) (noting that parent failed to implement secondary change and failed to adjust circumstances to meet the needs of the child). For all the work Father did toward reintegration, he cannot demonstrate that he changed anything within his control to alleviate the trauma that F.J. suffered or to prevent it from occurring in the future.

For all these reasons, the district court's finding that Father failed to adjust his circumstances to meet the needs of F.J. is also supported by clear and convincing evidence.

## II. *Best Interests of the Child*

The district court also found that termination of Father's parental rights would be in F.J.'s best interests considering her physical, mental, or emotional health. Father does not challenge this finding on appeal, and as a result, has waived any such argument. For the myriads of reasons outlined above, we find the district court's discretionary determination of the child's best interests was supported by a preponderance of the available evidence. See *In re M.S.*, 56 Kan. App. 2d at 1264 (citing *In re R.S.*, 50 Kan. App. 2d at 1116).

Affirmed.